First case this morning is Shulte v. Flowers for the appellant, Mr. Hennessey and Mr. Cox. Who's going to argue? I will, Your Honor. And for the athlete, Mr. Scott and Mr. Grimrod? I'll be arguing. All right. You may proceed. May it please the Court, Counsel. Good morning. My name is David Hennessey from Feldman, Wasser, Draper, and Cox. I'm here today on behalf of Art and Diane Shulte, the plaintiffs and appellants in this case. This case involves damages to the Shultes' property, allegedly caused by Mr. Flowers altering his property directly across Terminal Avenue and Springfield. Following a bench trial in this case, the trial court issued findings of fact in favor of the Shultes and awarded them damages. After Mr. Flowers filed a motion for reconsideration, the trial court then reversed its prior judgment and issued no new findings of fact. On what basis? That's a large reason we're here today, Your Honor. We're not exactly sure what the basis is. The trial court issued a basic order vacating its prior judgment and simply awarding vaguely a judgment as to all issues in favor of Mr. Flowers. There were no new findings of fact, no new conclusions of law. Did the court express concern about the lack of expert testimony? I don't recall the court specifically discussing the lack of expert testimony. We presented an expert at trial, Gina Furman, with respect to the engineering issues that were taking place, the flooding issues that were taking place. There was some discussion from Mr. Flowers' counsel regarding the lack of expert testimony with regard to the conversion that took place on Mr. Flowers' property and whether that would increase the runoff from that property. We would posit that if you look at the case law in this area that we cited in our briefs, as well as just common sense, you can see the sort of activities that he conducted on his property, converting it from its natural state with vegetation and topsoil and converting it into what he now describes as a parking lot for a storage facility that stores heavy garbage trucks, 1,800-pound roll-off dumpsters, and quarter bodies, among other equipment. It necessarily, with the lack of surface area and the lack of permeability in its current state, will increase water runoff. It doesn't take an expert to tell you that much. It doesn't take a degree in engineering to know that that will necessarily happen. And I think if you look at the case law, you will see that in other cases, the simple testimony and circumstantial evidence of the conversion dictates that the water runoff is proven by proponents of the evidence. Today we will be asking that this Court reverse the trial court's ruling on the motion to reconsider and reinstate the November 3, 2011, order in favor of the Schultes. I will address three primary points. First, I will discuss the standard review in this case. Then I will analyze the weight of the evidence in the record. And finally, I will highlight the denial of effective judicial review we believe has occurred in this case. Both parties noted in the briefs that abuse of discretion is generally the standard review on appeal from a motion to reconsider. However, as noted in the case of People v. 280,020 U.S. dollars, a motion to reconsider based only on a purported misapplication or application of existing law must be reviewed in November, in addition to numerous other cases cited in our brief. The Court in U.S. Currency explains that the well-established reasons for filing a motion to reconsider are threefold. We have bringing newly discovered evidence to light, highlighting changes that have occurred in the law since the judgment was entered, and finally, revealing errors that the trial court made in its application of existing law. Here we have a motion to reconsider that lacks any new evidence or any changes in the law. It simply asks the Court to reconsider its position with the application to the existing law, which is well-settled in drainage cases. Ultimately, we must presume, as I mentioned, that the trial court has made some sort of reconsideration and completely reversed its course. But unfortunately, we don't have conclusions of law or findings of fact in that final order to tell us what exactly they did. But regardless of the standard review that is applied here, we think that the overwhelming evidence in this case can only support a judgment in favor of the Schultes. As noted throughout both briefs and as I just mentioned, the well-settled law here dictates that a defendant may not unreasonably increase the water runoff from his property onto the property of a neighbor such that it damages the neighbor's property. Here, as I mentioned, both Mr. Flowers and his employee, his longtime employee, Peter Devos, testified at great length about the conversion that took place. They themselves described it as now being a parking lot storing heavy equipment. They have created a storage facility by removing six inches of topsoil, compacting some of that soil, placing rock throughout the facility, then rolling two and a half acres of that rock to further harden it to the extent that a large garbage truck will not create ruts in that rock. Thereafter, he even constructed a large steel building on the property on top of an impermeable concrete slab that was placed on top of compacted clay. As I mentioned, I don't think it takes an expert to understand what that's going to cause as far as surface water running off of it. It's really tantamount to taking a sponge and filling it with plaster. We took something in its natural state that will naturally absorb surface water and created a situation where water will necessarily run off of it. As I mentioned, the use of the property will simply exacerbate the problem. Again, going to the case hall we cited in our brief, when you take a surface area and place large pieces of property on top of it, equipment, whatever it may be, one of the cases we cited references mobile homes,  obviously preventing the amount of natural absorption that might occur. In fact, the effect of the construction was so apparent that Mr. Schulte himself, during the construction that was taking place across the street from his property, approached Mr. Flowers and raised his concerns about the water runoff that might occur. Mr. Flowers acknowledged the issue, but never did anything to stop it regarding placing some larger rock on the back side of his property. The flooding has ended up being so severe that at trial, we presented four longstanding tenants, all of which have lived in the mobile home park for at least nine years. All of them testified consistently that since 2006 and 2007, when this construction took place, the flooding has drastically increased. All of them acknowledged that there was some flooding in the area. But it's not disputed that our client's property isn't a low point. That's because it's a survey in the state to Mr. Flowers' property. But in fact, they all testified consistently that now, one of them described, a rolling river runs through their property, causing significant damage. Throughout the entire trial, as you'll note, it was a four-day trial. There was only one witness that was truly independent, and by either party. His name is George Farrin. He's a Sangamon County Highway Department employee who works just down the street from the properties that we're discussing. Mr. Farrin, for 15 years, has driven back and forth on a daily basis. He has an intimate knowledge of that road that divides the two properties and the flooding that takes place. On both direct and cross-examination, he testified consistently and emphatically that the water is much heavier since the conversion of the property. He personally witnessed the construction across the street. He has seen with his own eyes the water flowing heavily off of Mr. Flowers' property, flowing into the mobile home park, and causing damage. At no point did he waver with respect to the amount of water and what was causing the water to flood through the mobile home park. And he stated that the flooding was never even close to as severe as it is now before the conversion took place. Then we have Art Schulte and his employee, who obviously are less independent in this case. Both of them testified consistently, though, that the flooding did exist beforehand, but it was minor and not a nuisance. It has risen to the level of a complete nuisance since the conversion across the street took place. The record also includes the direct evidence provided by our client, both photos and videos that recorded water coming off of the property, flowing into the mobile home park, and the damage that it left thereafter. In addition to that, Mr. Schulte kept a calendar of flood events, which is also in the record for your review. As Flowers failed to take action on the severe flooding, the Schultes then took some escalating methods of mitigating the damages that were occurring, again demonstrating that this was becoming a greater and greater problem on their property. Eventually, Mr. Schulte ended up hiring an engineer who testified at trial, Gina Furman, our expert in this case, to help mitigate the damages that were occurring. And in fact, while they couldn't prevent the flooding from happening, they were able to get the water to reduce. The evidence in the record even demonstrates that Flowers himself was aware of the problem, which I mentioned. We have him, after talking with Mr. Schulte, he acknowledged in his testimony that he then used his expert in this case, Jay Jessen, to design a retention basin on his property that would reduce this problem and fix this problem. Jessen then testified clearly that he created that system. It would reduce the issue. It would correct the issue. The hang-up, allegedly, was that a constrictor pipe had to be placed on county property. Now, that's an obvious issue, but Jessen himself was able to go to the county and get the county's approval. The county said, go ahead, do the plan, fix the issue. Mr. Jessen turned that over to Mr. Flowers, yet Mr. Flowers never acted. Mr. Flowers himself testified he even thereafter received oral approval for this plan. But again, he claims that he didn't follow through to fix the issue because of politics. He was concerned about politics changing in Sigmund County. Ultimately, as mentioned in our brief, the case law in Doven versus Winfield Township has developed a balancing test to look at the harms between the parties and the relative social value of the tasks being undertaken by each party. We have our client, Mr. Schulte, operating a mobile home park that's home to more than 30 families across the street from a sanitation business, a storage facility for a sanitation business, which obviously has some value, but I would argue that it has much less social value to the homes across the street. And when you look at the harms that are taking place, there are people that testified about being displaced from their homes, having their children being unable to come home because of the flooding, being unable to leave their homes. When you balance that against Mr. Flowers, who has a plan that he could have implemented long ago to fix this issue by just dedicating a small part of his property that he claims he does not use, back half of his property he claims is used simply to correct the water runoff, so he could have implemented the system. Based on all of the evidence in the record, we feel that it is overwhelming and that there is no way you could have any other determination than to find in favor of the Schultes in this case. The limited evidence in favor of Mr. Flowers certainly pales in comparison to that presented in the record on behalf of the Schultes. And the bottom line today is we feel that there has been a denial of effective judicial review from the trial court. As I mentioned, there has been no explanation whatsoever for our client as to why immediately following trial, the trial court was able to write a lengthy order with very clear findings of fact in favor of our client. While the record was the most fresh, the trial court made that ruling. Then thereafter, hearing a basic motion to reconsider, asking the court to reconsider its case, the trial court then signed an order drafted by Mr. Flowers' counsel for it that gave no explanation whatsoever. We feel there is just a fundamental problem with that because we have no way to describe to our client what is even taking place, let alone as the public is supposed to understand their legal relationships with one another, when a ruling might come down in this way that we have findings of fact and they're in your favor, but in fact in the end you lose and we're not exactly sure. Did you ever ask the court to explain the change in position? Your Honor, I personally was not involved at that point, and I would say that I'm unaware of any formal method to ask the court to do that. I know that we received notice of the decision in a letter that was copied to our office, and at that point the decision was rendered and there was no explanation given. You could have asked for one, couldn't you? As I said, Your Honor, I'm unaware of any formal method by which we could have asked for an explanation. You want the standard of review to be de novo? Yes, Your Honor. If we look at the whole case, then we begin to ask questions, or if we look at the evidence as well, we begin to ask questions about rainfall for one thing. Yes, Your Honor. You didn't mention that at all. Is a 30% increase in rainfall over a period of three years at all significant? Your Honor, I would say that it's not significant. When we're dealing with surface water, rainfall is the necessary agent to create flooding. Right. We have no creek or river or anything of that nature in the area, so heavy rainfall is necessary. If you look at the record throughout the testimony, each witness describes heavy rainfall being the agent for that in the past and currently. But in the past, Mr. Farrin particularly, but even Mr., excuse me, the city employee who testified on behalf of Mr. Flowers even acknowledged that in the past, heavy rainfall would cause flooding. But the bottom line is the flooding was not to the extent that it is now. I understand that, but during the period when the flooding was an ankle-deep problem, the average rainfall was over a decade. It was this. And for the next three consecutive years, it's 30% higher. And that's when the flooding, I mean, that's when the complaint about flooding has prompted this litigation. I don't understand how you leave that out of the formula. Yes, Your Honor. Well, there's a flaw in looking at average rainfall in that manner because you could have low rainfall one year but have large instances of that rainfall. This particular year is a good example of that. We have relatively no rainfall, but we've had a couple of days of very significant rainfall. So that could explain the situation. And there's no dispute as to the climatological data that claims that the rainfall is higher. But, in fact, that's not a defense for Mr. Flowers. If you look at the case law we've cited, there's a case law that demonstrates that flooding only occurs in heavy rainfall. And that's not a positive claim that damage is occurring and it's been caused by changes on a neighboring property. Well, if flooding occurs during heavy rainfall, then the connection is what's necessary. The connection between the flooding and the alteration of the property. Correct? Correct. What about the alteration of the other 4.2 acres? The county materials property? Well, Mr. Flowers began the alteration there. First, I would state that, as mentioned in our reply brief, the county materials evidence was barred by the trial court. But even given that, that argument I find convenient for our case because they are arguing the removal of topsoil, the rocking of that property, and things of that nature are increasing the runoff of county materials such that it's damaging our client's property. But, in fact, those are the very type of conversion activities that were taking place on Mr. Flowers' property. And, in fact, Mr. Flowers went even further than they did to create that increased runoff. And there's direct evidence showing the runoff coming off the property in the form of videos and photos. And there's extensive testimony in the record demonstrating that. So the testimony of the witness and the video, which stated that the water was flowing off of county materials, either more heavily or more directly, was barred? Yes, Your Honor. Yes, Your Honor. During Mr. Flowers' testimony, the objection was initially raised with regard to the answers to interrogatories provided at the trial court level. It came up first during, I believe it was Mr. Ruzic's testimony. And at first, the court ruled in favor of Mr. Flowers. But the objection was raised again, as mentioned in our reply brief, when Mr. Flowers was giving his testimony. And, in fact, the trial court changed its position and decided that, based on the answers to interrogatories, they were insufficient to present evidence with respect to the county materials argument. If there's no further questions, then I'm done. So the court barred it based upon a foundation objection, not because it was irrelevant? Based upon a foundation, yes, Your Honor. Because in discovery, they failed to disclose it in response to the interrogators. You'll have additional time on rebuttal. Thank you, Your Honor. Mr. Scott. Please, the court. Counsel. My name is Gregory Scott, and I am Jason Germer. I represent Mr. Flowers. First of all, Your Honor or Justices, the counsel's wrong. There was not a barring of the evidence concerning county materials and all of the flooding associated with county materials. I would suggest that the court review Volume 7, page 43. This was brought up in their reply brief, or otherwise we would have addressed it earlier for the court. And, specifically, pages 43 and 44, and the objection was whether or not Mr. Flowers could talk about the improvements that he observed on county materials. And they raised the issue that Mr. Flowers was not disclosed as going to be speaking about that. And then the court said, okay, then Mr. Flowers cannot. Specifically on page 43 of Volume 7, the court says this is different than what we were talking about the previous week when they brought up this objection. And when Mr. Wheatley, who is the person that owns F&W's business that's directly south of the Schultes, was talking about the construction of county materials and how it affected the water flow. And you have numerous references, some of them brought up by Mr. Schultes' counsel during cross-examination of how county materials' property and what they did to their property caused the majority of, or a good portion of, the water. And I would suggest, Your Honor, that you look at their videos and their pictures that they produced. And we blew up probably because we need to see bigger pictures than the smaller ones. But look at our Defendant's Exhibits 15, 16, 18. There's clear demarcation. The water is coming off of county materials. Their videos show the gushing water comes off of county materials. And what they don't explain, and this is Justice Connect, you brought this up, this property the Schultes own is at the bottom of a 50-acre drainage basin. They own property at the bottom of a 50-acre drainage, and our client owns 4 1⁄2 acres of that drainage. And one of the things that Justice, or excuse me, that Judge Kavanaugh specifically brought up, and Justice Turner, you brought this up, he specifically, as we note in our brief on page 32, said, where is the evidence from an expert that says whatever Mr. Flowers did here caused an unreasonable buildup of water that caused this flooding? I know the court wasn't there, but if you look at this setting of where this trailer park sits, you have from the south, the county has a big facility up here, and they have a 21-inch drain that drains all their water down to Mr. Schulte. And Mr. Wheatley testified that once that thing was installed, there was a big increase of water. Additionally, right where Flowers' property is, he bought 9 acres. He sold 4 1⁄2 on the east side to County Materials. He did not, contrary to what they said in their reply argument, he did not do much work on County Materials at all. He cleared a little bit, and he took a very small, if you look at Mr. DeVos' testimony, a very small number of loads of dirt off of there, but they, County Materials, brought in truckloads and truckloads and truckloads of hard packed rock that they packed down. They cut a channel so that they would focus their water into a natural drainage ditch, which is called Sidings Road, that flows down to the lowest point. Now, Justice Kinect, you brought up the issue of rainfall. The two experts, Jessen and Furling, both defined for the court what a tenure event is. A tenure event is an unusual rainfall that's going to occur, and one defines it as a one-inch rainfall, one of them defines it as an inch-and-a-half rainfall. And in this time period, if you use the one inch, there were 42 tenure events with regard to rain. If you use the one-and-a-half inch, there were 23 tenure events. Everybody that testified, bar none, said this flooding problem occurred during heavy rains. And that's one of the problems that the plaintiff has, is that these heavy rains caused the biggest part of this problem. The other thing is that Mr. Tapkin and Mr. Schulte and their witnesses acknowledged that in 2011, there wasn't rain, and it stopped, it wasn't flooding. Each of these four people that came from the trailer part, or from the mobile home part, all acknowledged they never went back and saw anything that County Materials was doing. They didn't even know about the construction on the four-and-a-half acres by County Materials. And if you look at these pictures, it's obvious the differences between what's happened in one versus the other. Mr. Flowers took a lot of effort to make sure that he didn't increase water flow and that he took action to restrict water flow. And what he did is he kept the same elevation, same slope. He slanted it the same way it was before. The vegetation that they said he took off was primarily saplings that were in trees or were in fences and a little bit of scrub brush. He took off junk cars. He took off piles of asphalt. He took off roadways of asphalt, and he made it so that he could have it as a storage facility. The top half of his land, he compacted and put two-and-a-half inch or the small rock in. The bottom half, he put very large rock in, and he windrowed it. So he braided it so it would be like catch basins, I guess that's what he would say. The testimony was that when it would rain, it would puddle in those areas. So it's a catch-all. They talk about Mr. Jessen's design. Mr. Jessen, as he specifically testified, designed this system to only deal with the four-and-a-half acres. He specifically said it's not going to touch this 50-acre property. Additionally, he stuck it on Sidings Road on the county's property, or actually the township's property, and it required backing up the county's 21-inch water pipe. Now that backs into the township, it backs into Lindsay Electric, it backs into the county. You might well imagine that my client doesn't want to stop water and force it back onto somebody else's property without somebody signing off on it and riding it. Because I guarantee you, if he flooded out all those places, somebody's going to say, where's your written authority? But that's a smokescreen. Jessen said this doesn't work unless you restrict the water and push it back uphill, in essence, or not let it come down as much. So we have the issue of the 50-acre drainage. We have the issue that Jessen testified to, that county materials also removed in the last five years a railroad berm, so now we've got more water coming. We also have the fact that this place flooded. It flooded before Mr. Flowers ever showed up. If you believe Mr. Wheatley, there's less water coming off of Flowers' property now than what was there before. So what we have is, we also had, there was another thing, I don't know if the record is clear to the court, that 21-inch pipe comes down and at the juncture at Sidings Road and the ditch in Flowers' property, it makes a 90-degree turn into Schulte's property. It goes from 21, 90-degree turn, 18-inch. Obviously, 21-inch to 18-inch is going to cause a backup. And in addition, when this was all going down during these three years, our engineer ran a camera through and found that part of the reason it was flooding is there was a big chunk of concrete in Schulte's pipe, which was removed by Mr. Tappan. It is important that, as you look at this record, that both Mr. Schulte and Mr. Tappan, who did the videos and did the pictures, both acknowledged there was substantial water rushing off of county materials into that ditch flooding their property. Everybody said that. The problem is that they don't acknowledge that they have to prove causation. And we've got these five factors going. We've got the tile, we've got the railroad removal, we've got the 50 acres draining into a pond, we've got the big rains, and we've got an obstruction in the pipe. Would the water from your client also end up in that drainage part? Yeah, they all go to that one area. The pipe is clogged. You can't stop it. I mean, that's the bottom area of 50 acres. When and why did the light bulb go off for Judge Kavanaugh? Actually, Judge, after we filed a motion to reconsider, and we came back, and we asked him to reconsider the facts. And basically we said, there's no causation here. And we argued that, and he specifically then started looking at these five factors, including there's no evidence from an expert that says this problem was caused. Well, does it really take an expert when you have people that live there saying it's now a knee, it gets knee deep and it used to only get ankle deep, and this didn't happen until 4.5 acres was altered, and isn't that circumstantial evidence that, geez, they changed this property, now it gets knee deep, not ankle deep? Well, you have to balance with the people that are talking. The people that are talking didn't realize that there were nine acres being fixed at the same time. The people that are talking didn't have, they said it was heavy rains. And everybody acknowledges during those three-year period there were excessive rains and it caused flooding in the area. And so what they said is, okay, there's heavy rains. We saw the front half of the property being improved. We don't know what's going on behind it. And then when you take that plus the video evidence and their picture evidence, you balance it all together and you have to say, okay, you're good people. You understand suddenly it's higher. But you have to coordinate all these things and say Flowers' work that he did on his property was a causation factor of the damage, and that's what you couldn't do. And I think that's when Judge Kavanaugh said you didn't prove your case. And I think that it's not a de novo review in my opinion. It's abuse of discretion if you're going to go with a motion for reconsideration. I believe that if they had this concern about judicial review, I believe under the law of Illinois when it's a new finding and a new ruling, they have 30 days to ask, which they didn't do. So I don't think that should be an issue. I think even if it's not abuse of discretion, it's manifest way to the evidence. I think under both standards it should be affirmed. We gave the court case law that said when there is an order that says, which this one says, that the court being fully advised in the premises, when it makes that statement, like this order says, that the court on review presumes that the trial court had enough finding of facts to enter the order it did, and absent evidence in the record that would not support such a ruling, that it should be affirmed. And we've given you the cases on that. And that's what we're asking you to do. It's a case where, unfortunately, a person bought and owns property at the bottom of a bowl. And unfortunately, we had huge rains. And there was construction in the area. And the majority of the evidence as to the flooding doesn't come from my client. It's their evidence. Their person, Mr. Tafkin, the one that takes the pictures, takes the videos, in his testimony admits, yeah, this isn't on Flowers. This is on County Materials. Yeah, the big gushing water that runs into this channel that floods the mobile home park is County Materials. So Mr. Flowers isn't liable for County Materials. He didn't make those improvements on County Materials. He didn't put 8 to 10 inches of rock and pack it down. What did he do? He cleared the cars off and the trucks? As Mr. DeVos tried to testify to, there was a 100-by-100 area where there was some kind of junk truck or bus stuck in the ground. And he dug that out. And he removed a few, as Mr. DeVos said, a few truckloads, very small truckloads of dirt. And as he said, we left it as is. So this is land that once you clear off all it, he cleared the junk cars, which were primarily in the first half, and the rows of that. But the back half, he sold to County Materials, and they took it over and did what they wanted to do. So, Your Honors, we would ask that after you review the entire record, that you affirm the trial report. Thank you. Thank you. Rebuttal? Thank you, Your Honors. Ultimately, some of the parts here in the record is that this flooding did not occur before Mr. Flowers fundamentally converted his property into a parking lot storage facility for his sanitation business. Mr. Scott referenced the type of vegetation and junk that was on the land that was cleared. The vegetation was described as both dense and unkempt. There were rows of vehicles, but the rows were 15 feet wide, and in between them was largely vegetation. Mr. Devos testified that before selling the property, they cleared and leveled the land was the terminology he used. Mr. Scott referenced Mr. Wheatley's testimony. He's the sole witness in a concert of witnesses that claim the flooding is significantly higher now to say that actually the flooding is higher,  not only is that unbelievable, but it's convenient that Mr. Wheatley has over a 10-year business relationship with Mr. Flowers. Let's go back to you telling me that evidence about counting materials was barred, and your witness testified that the videos that he took in May of 2008 and June of 2010 showed heavy water drainage off of county materials, and even tracked where it went, where it went into the ditch, where it overflowed the road, and where it flooded the very area that we're talking about. Now that sounds to me like there was evidence regarding county materials. Well, Your Honor, I would suggest that the ruling of the trial court would bar that that testimony came out on cross-examination on questioning from Mr. Scott. He was getting at specific photographs and videos that were being viewed by the court and asking him, isn't that water coming off of there? And he did, in fact, say that there was. We're not disputing that county materials releases water. There's no dispute that this is a low point. There's no dispute that flooding has always occurred. What is in the record is that the flooding never occurred to the extent that it does since Mr. Flowers, directly across the street, created a parking lot storage facility. That is what is clear in the record. In addition to case law, in our brief we mentioned several cases that support the proposition that the source of the water is not critical and it's not dispositive. The amount of the water is what is critical. And the change that is increasing the water. To your question's just disconnect regarding the rainfall. For example, in the case Starcevich that we referenced, they referenced that the flooding is occurring during, quote, heavy rainstorms. The rain is a necessary factor in these cases. That's what's going to cause flooding, absent a creek or river or some other body of water being redirected. And finally, the 25 years is the time that our client has owned this piece of property. So I think that Mr. Flowers is trying to suggest that in the previous 20 years there was no heavy rainfall. But in fact, nature gives us rainfall. It comes and it goes. There may have been higher rainfall in some years than not. But the bottom line, the flooding of its current extent did not occur until after Mr. Flowers converted this property. And one last point. Mr. Scott referenced the trial court having enough, we assume in the case law, that there's enough facts to support a decision. But I would question, going back to the effective judicial review, what were those facts? We do have written factual findings. They're very detailed in the initial order that are all in favor of our client. But now, absent any explanation whatsoever, we have a complete reversal of fortune. That's all, Your Honor. Thank you. We'll take this matter under advisement and stand at brief recess until the readiness of the next case.